Good morning, Your Honors. Michael Withee on behalf of Pande Cameron and the Andonian Brothers. I would like to reserve five minutes, and Mr. Rowley, my co-counsel, will take the rebuttal. Your Honors, this is in essence a nuisance-taking case brought under both state and federal inverse condemnation law. The fundamental importance of just compensation for the taking or damaging of property rights here, property and a leasehold interest, are so important to our Constitution that we believe the magistrate erred in granting summary judgment based on disputed facts and resolved inferences against the appellants. Let me ask you the question that I asked counsel just previously. In this particular matter, it's my understanding that you all agreed to a court trial before the magistrate judge. That's correct, Your Honor. And it's my understanding then, because there was a court trial before the magistrate judge, that we would have a little bit different standard on summary review in Washington than it would be if it was a jury trial. That in fact, in Washington, rather than giving every benefit of the doubt to the non-moving party, because it is a court trial, one would allow the magistrate judge to evaluate the evidence. Your Honor, Judge Smith, this was not a court trial. This was summary judgment pleadings. There was no law. Just a minute. As I understand it, however, this was going to be a magistrate judge court trial. But it never happened. Well, but you'd waived the jury. Correct. And therefore, it would have been a court trial. And the evidence was then given in affidavit to the district court, in this instance the magistrate. And there would have been no reason then to wait for the weighing of the evidence on summary judgment, because he would have had the trial to make anyway. No, I really totally disagree with that presumption. The judge magistrate. Is there any Washington law to suggest that we don't give some deference to him in looking at the affidavits? There's neither Washington law or federal law that supports the proposition that the judge magistrate ruling on a 56th summary judgment should do anything other than resolve inferences in favor of the plaintiff in the case and not resolve factual issues. The law is absolutely clear on that, both Washington law as well as the federal law. That's what this judge magistrate. Do you represent Camerons in this particular matter? I represent Panda Cameron and the Andonian Brothers, Your Honor. All right. As I understand from the facts, Cameron made a decision in 2003 to vacate the Pine property. Your Honor, that's correct in part. Just a minute. As I understand, they made a decision to vacate. Therefore, in 2003, much prior to the start of the construction, where is the deprivation if they've already decided to vacate? Your Honor, the evidence is, and this is in the excerpts of Record 185, that Mr. Andonian, on behalf of Panda Cameron and the Andonian Brothers, was shown the plans of Sound Transit. They had suffered impact from the tunnel construction in downtown Seattle and were well aware of the potential here because they would be in ground zero. Let me ask you, are there any cases which would suggest that one gets compensation for ending a lease in anticipation of the construction? It wasn't ended in anticipation, Your Honor. There was 10 months of construction that this tenant was forced to suffer from, grave impacts, vibrations, noise, dust, everything. Let's go to that. Cameron voluntarily vacated the property. They did that after speaking with Sound Transit in 2004, and that's what you've been giving reference to. What's the deprivation of that? The deprivation is the fact that they could not operate their business and their lease was useless and worthless, and that's a violation of their property rights. They could not function in that location because there was a huge construction project right on their doorstep that created all the impacts that Sound Transit predicted, by the way, in their environmental impact statement. They say there will be severe nuisance impacts on the property owners and they may fail or be forced to relocate. That prediction came true as the Panic Cameron and the Andonians. It's my understanding that the Camerons vacated the lease prior to the construction of the underlying tunnel. That's not true, Your Honor. They left the premises and stopped paying rent in February of 2005, almost a year after the tentative decision was reached because they saw how bad this was going to be, and what essentially the magistrate judge felt is, well, no, they should have gone ahead and suffered the impacts first and then decided, but there's no case law that says that the impacts themselves weren't a nuisance and did not justify. It wasn't only Panic Cameron, Your Honor. It was also the Braceth Art Gallery that was forced to abandon their tenancy. The Art Gallery isn't here, right? Well, but the Andonians, the Art Gallery is not here, Your Honor. I understand as to the Andonians, but as we deal with Cameron, we don't have to worry about the Art Gallery as to Cameron itself. Correct. Now, as I read the record, at best there were two days of construction noise that exceeded the permissible levels, and then for only 10 to 15 minutes. I think the exceeded, that's correct, on that particular, that's the only time that. As to the construction noise. Then where is the deprivation that comes from two days of construction noise that exceeds permissible levels and then for only 10 to 15 minutes? Well, the Martin case does not require exceeding the levels, Your Honor. It only requires a continuous and recurring nuisance and impact. In this case, the decibel levels at 90, which were close to the legal limit, were present on a routine basis throughout the time when Panic Cameron operated these premises. So it was extremely noisy. At 90 decibels, 85 decibels, you cannot sell rugs. You cannot hold a business conversation. You have vibrations that by the plan threaten the architectural structure of these buildings. That was in the plan. And then as to individual incidents from reading the record, the best I can find is there was a truck blocking the way one time. There was flagman misdirecting traffic, and there was a couple of customers that were having to drive another couple of blocks to get to their business. The impacts were far greater than that, with all due respect, Your Honor. In the record, the impacts are from both John Brasvis, as well as Brad Endonia, and his testimony was they could not operate their business. There was a huge, huge. Have you got that outline someplace? It's on pages 9 through 15 of our brief, Your Honor. The evidence is overwhelming, even in the photographs, that there was a huge disruption of the traffic flow. There was construction right in front of, in the breaking and pile driving and the wrecking of the concrete. That was all anticipated in the plan and was told to Mr. Endonia. As to the Endonians, it's my understanding that you make no claim regarding the sale of the property, the value of it? Correct. The loss in this case is the loss of fair rental value. That's established. What is the evidence that you were precluded from renting the property in this record? Well, number one, that Chuck Endonia has been in this business for many years and Brasvis could not operate his premises. Number two. What is in the record that suggests you even tried to rent? I mean, I can suggest that they have these qualifications, but I'm looking for evidence that you were precluded from renting or that you even tried to rent or that you made even any efforts to rent it. Your Honor, I'm glad you asked that question because the district magistrate found that there was no efforts. In fact, it's directly contradicted. Where in this record? In Excerpt ER 185. What does it say? It says that Mr. Endonian attempted to get Sound Transit to use his premises for part of their construction zone project, which was right across the street, and offered them the opportunity to rent the place. Now, that to me is trying to find a tenant. Well, as I understand it, there was one circumstance where one of the Endonians said that his brother approached somebody about a lease. Correct. And the brother denied even doing it. No, that's not correct, Your Honor. Charles Endonian testified undisputed that he attempted, on various occasions he got inquiries to him in his office about renting the place. Now, Your Honors, it's an inference, by the way, that if you look at these photographs, and those were present when the Endonians were there throughout, including a 840-foot ditch 60 feet deep and 30 feet wide in front of their property with construction activities with demolition going on, that the inference to be drawn is that you're not going to rent that property other than to Sound Transit to whom they offered it. So if the premise is they didn't try to rent it, that's a false premise, because clearly they tried to rent it to Sound Transit. And Sound Transit didn't want it, the one entity that might have been able to usefully use it. But how is a retail business supposed to survive in this? Let me ask you another question. It's my understanding that in Washington, the damages for interfering with the use or enjoyment of one's property is a subsequent decline in value. No, Your Honor. Under North Coast, as well as in federal law, the measures are damages and loss of fair rental value. In other words, the Endonian brothers lost the rental value from both Brasseth, as well as Panda Cameron, from February 2006 throughout the rest of the lease, for two years they had no rent. What evidence do I have of a decline in rental value? Well, it was a decline in the fact that nobody wanted to rent the place and the fact that the people who had been tenants there moved out. That's the loss here. There's no money evidence of any decline. We're just saying someone didn't want to rent. Is that what we're saying? No, they would love to have found somebody to rent. They offered it to Sound Transit. If it was worth anything, Sound Transit should have taken them up on it. But they lost the rent. That's the values. And, of course, the magistrate never got to that issue. But that is compensable under the case law. Honest, I was just looking in here because it seemed to me that if I was going to try to compensate somebody or find some evidence in here that would go to the compensation and undo the summary judgment, I either ought to find, one, they tried to rent it, and so I ask you about that. Then the second is, having tried to rent it and renting it, they had a decline in value. I guess your total argument, then, is we tried to rent but couldn't. But we have no evidence in here about what we could have got if we did rent. Well, the evidence in the inference is they couldn't have rented, therefore, they got nothing, and, therefore, that's the value. That's up to the trier of fact to determine, Your Honor. Well, but I'm trying to find some facts to try. Well, the facts are the evidence. The evidence is in the record as to how much the rent was, both Brasseth as well as Panda Cameron. That's the loss, and that's recognized by both Washington as well as federal case law, Your Honor. Thank you. Was Paul Andonian deposed? I don't believe he was, Judge Hawkins. It was Charles Andonian who was deposed. Paul was deposed. Yes, I'm sorry. Beg your pardon. What efforts did you make to lease the building after Panda Cameron and Woodside Brasseth have repressed the other tenant moved out? I made no efforts personally. Do you know anyone who did? No, I do not. Do you know if anyone did? No. There was talk about it. Is that the proof? That's the proof from Paul. The proof from Charles Andonian, who was the managing partner, by the way. Paul had really nothing to do with running the business or attempting to rent it, and the fact he wasn't aware of it is not evidence. The evidence is that Charles Andonian offered Sound Transit, number one. They could rent this place because they could have used it for administrative purposes, number one. So if the issue is ---- So I should look at Charles' deposition? Yes, in Exhibit 185. I'm sorry, ER 185, Your Honor. Mr. Andonian, Charles Andonian discusses the impact on his business and his property in his deposition in the manners that I've quoted in the brief, Your Honor. And I think the inference from that is that, first of all, he had an interest in making up for the lost rent. So he had an interest in renting it if he could. He had offered it to Sound Transit. He had a few inquiries from a number of people. But if you see and hear his testimony, as the trial court should have in live testimony, about what was going on in the street at the time of this construction project for years and years, a trier of fact is reasonably able to conclude that nobody would have wanted to rent this place. And therefore, the loss of rental value is the measure of damages, Your Honor. If I have a little bit more time, I'd like to address the federal constitutional issue. Go ahead. Well, first of all, the test in Washington under Martin, which the respondents did nothing to contest, is not whether it was or was not permanent. It's whether it's recurring or continuous under both the Martin case as well as under the other cases that we've cited in our brief, including the North Pacific Railway case. So the court, in deciding you had to have a permanent damaging, erred, and the court said there can only be a recovery for temporary damaging where it's a regulatory context. Now, that's the distinction that's nowhere in Washington law, and that's why we've asked this court to certify that issue to the Washington Supreme Court. And by the way, the Martin case was unanimous and was reaffirmed in the Highline School District case we cite. In other words, that's the law in Washington. You don't need to have a permanent damage or taking. You can have one that's recurring and continuous, and in this case the facts certainly support the fact it was continuous and recurring. But interestingly, under the federal scheme, under the Richards case that we cited, plaintiffs can recover because the cumulative impacts of the defendant's nuisance caused substantial and peculiar damages to plaintiffs. And that evidence exists because it was only Panda Cameron who lost their tenants in this project. It was only Cameron and Andonians that had the construction staging right in front of their building, and the Paramount Theater, for instance, was down the block and did not suffer the same kind of nuisance damages. And the fact that there were two huge holes dug right in front of their property certainly showed the level of noise and dust and disruption that was testified to. No one else experienced those impacts. So it was up to the trier of fact, Your Honor, in this case, live testimony, hearing from the witnesses, listening to the evidence, not just on paper, that the court erred in doing, and under de novo review, we believe ample evidence exists for those impacts. If I have only 3 minutes and 50 seconds left, I'm going to defer. Thank you very much, Your Honor. Better give him some since you said he'd give him 5. Good morning. May it please the court, my name is Matt Siegel from K&L Gates, and I'm representing the two respondents, Sound Transit and the City of Seattle. The district court properly dismissed this case below, and we are respectfully requesting that this court affirm the dismissal and also deny the motion for certification. The appellant's argument, as you heard, is that when a local government engages in a public works project in the public right-of-way, that the government must exercise eminent domain in advance to acquire the properties that may be temporarily or intermittently impacted by construction in the future. This was not a dismissal, was it? Yes, it was, Your Honor. It was a dismissal of- But there were cross motions for summary judgment? That is correct, Your Honor. There were cross motions for summary judgment. The plaintiffs moved for judgment that their property rights had been interfered with as a matter of law. We moved for summary judgment of dismissal. At the summary judgment hearing, the district court judge asked the plaintiff's counsel if this meant that the taking claim could be resolved as a matter of law. Counsel agreed with that proposition, and so the trial court did, in fact, resolve all the claims, and the case was dismissed. The district court correctly dismissed the claims because there is no legal authority that supports the proposition that what is effectively a remedy, if any, is owed in tort, should be converted into a temporary off-property taking. You know, I don't mean to quibble with you. I'm reading what magistrate- Is it Donahue? Yes, Your Honor. Conclusion. For the following reason, defendant Sound Transit's motion for summary judgment, docket number blah, blah, blah, is granted. Defendant City of Seattle's motion for summary judgment, docket number blah, blah, blah, is granted. That's correct. How do you get that as a dismissal? So, Your Honor, we moved for- Sound Transit and the city moved for summary judgment on all claims. Only one claim is here on appeal now. That's the inverse condemnation. The plaintiffs had moved for partial summary judgment. Their motion for partial summary judgment was denied. Both the city and Sound Transit, the two defendants, their motions were granted. Those were full motions for summary judgment. And then- I want to take a look. Sure, sure. I just don't see anywhere where the word dismissal was used, and we usually associate that with a Rule 12 motion. These were MSJ's, motions for summary judgment. That's correct, Your Honor. I suppose that that's right if- They lost. That's correct, Your Honor. And there was a final judgment also entered following on those, and that is contained in the record. So, with respect, though, to the decisions of law made by the district court, the district court was correct in determining that there was no inverse condemnation claim here, first and foremost because a required element of that claim, a taking, was not met as a matter of law. And because that taking was not established, there was no basis for the case to proceed to trial. Now, this is not a typical taking allegation in this case, as I believe the court has already identified. There was no physical invasion here. There was no physical acquisition of property, nor was there an allegation of a regulatory taking. I think as appellant's counsel characterized it, this is a claim of a nuisance-type taking. And although there may be tort remedies when some temporary impact on a property interferes with a business, for example, many public works projects temporarily impact surrounding properties in some way. That is part of the reality of life in the urban core here, particularly when you're constructing a benefit in the public right-of-way that will substantially benefit the surrounding properties and the surrounding community, as was the case here. Did the City of Seattle or the Transit Authority have any relocations plans or opportunities for businesses adversely impacted by this construction? Well, it's interesting that you raise that, Your Honor. Yes, they did. And, in fact, the record in this case shows that Brooke Bellman, who was one of the community relations persons for Sound Transit, actually invited Handy Cameron and the Andonians to submit a claim for relocation benefits. That email containing that invitation is contained in the record. Ultimately, they did not pursue that claim until years later when this particular case was filed. And then they asserted an entitlement to benefits under the Uniform Relocation Act, but that claim was abandoned on summary judgment, and it's not presently before the court. But, yes, Your Honor, the answer to your question is that there were, you know, arrangements made, inappropriate scenarios where a party would have been entitled to relocation benefits. Of course, the U.S. Supreme Court has concluded that relocation benefits are a form of consequential damage, so they're not recoverable under the Fifth and Fourteenth Amendment as a form of just compensation for taking. I wanted to talk about the continuous and recurring premise in conjunction with Washington law that's been raised by the Appellant's Counsel and about the requirement in Washington law, which is consistent with federal law, that this type of nuisance-taking theory be supported by some sort of permanent damage or permanent decline in the property value in order to be actionable as a taking. And one of the cases that was referred to by Appellant's Counsel is the Sunnyside case. In fact, that's relied on extensively in their briefing. And that case very clearly sets out that the damage has to be permanent, not temporary. And it talks also, admittedly, uses the phrase continuous and recurring. But I think, for example, this Court can look at one of its prior decisions in the Lewiston Orchards case. And I don't believe this is in the brief, but it's 862 F. 2nd. 184. And there's a lengthy footnote in there that talks about what that standard means, continuous and recurring. And it also relies on some earlier U.S. Supreme Court authority from flooding cases to elaborate on that, including United States v. Kress. And the conclusion that's drawn is that continuous and recurring means that an impact may not be happening every day, but it's certain to reoccur. So in the case of flooding, for example, you could have floodwaters that come onto your property every three months, and then they recede. So for the intervening periods there, the property's dry. But if we know they're going to recur because, for example, the government has dammed the river that's resulting in the impact, then that might be actionable. We don't have that here. What we have here is an indisputably temporary situation. And I also wanted to follow up on your inquiry, Judge Smith, about the record in this case with respect to that allegation. And I think that that's absolutely correct, is that the evidence that was actually submitted to the district court did not establish anything remotely close to three-year total taking, which is what was alleged. I absolutely concur with your description of the construction reports. And I can tell you from having worked on this case below that there were hundreds of construction reports. There was one essentially for every day that the project was going on. And there are five in the record. And Your Honor is correct that to the extent they even show some exceedance of the noise ordinance, for example, it's for a five- or ten-minute period on two days. We don't believe they even show an exceedance because if Your Honor looks at the testimony of Stephanie Kirby, who was the project engineer, as well as the EIS provisions which talk about decibel ranges, it says that decibel ranges in that realm are acceptable. But even if they were exceedances, they would be very temporary. And it's the same with the interferences with access that are alleged. These are the types of things that happen in downtown all the time, lane closures and redirection of traffic. And this is something that's incident to the government conducting improvements to its infrastructure. Finally, I also wanted to come back to this issue about the effort to lease because I think Judge Hawkins, your reference to Paul Andonian's testimony, that's one of the elements of the record that we relied on below. But each of the Andonians were asked this question, I believe. Paul was, Greg was, and Charles was. And for example, in the Pandy Cameron 30B6 deposition, Mr. Charles Andonian was asked, did Pandy Cameron, the business, make any efforts to lease any portion of the property? No. Did it make any effort to find a substitute tenant for the portion of that property that's vacated? No. And it continues. That's at Supplemental Excerpts of Record 273. Mr. Andonian was also deposed in his individual capacity. And in that capacity, he was asked, did you ever put up a for lease sign? No. Did you ever advertise the building for lease? No. That's at Supplemental Excerpts of Record 342 and continues for the next couple of pages after that. So the district court was certainly well within bounds in determining that concessions made in this deposition testimony established that there was absolutely no effort made to rent this property. During what rough period of time did the utility relocation take place? The utility relocation began, Your Honor, in April of 2004, and it concluded in September of 2004. And did that begin the tunnel construction phase? Did it go from that phase to the tunnel? No, Your Honor. So what happened was after the utility relocation was complete and, by the way, I should emphasize that even though that was the utility relocation period, that doesn't mean there was construction going on every day in that period. I'm just trying to give a framework on time. There was some preparatory work done toward the end of 2004 in preparation for the tunnel. There was a holiday moratorium at the end of 2004 through New Year's of 2005, so there was no construction at all during that period of any kind. And starting in 2005, that's when the tunnel construction began. That's about the time they abandoned the building? They, I believe, left in February of 2005. My answer is yes. Yes, it is, Your Honor. And let me emphasize something also about the tunnel construction and the suggestion that there was a giant ditch in the street and that this was something that was going on for a three-year period, because, again, that is not supported by the record. What the record demonstrates is that the majority of that construction occurred underground. That's why it's called cut and cover. You do go in and open up the street temporarily, and then you put a decking on so that traffic can go across the top and that the construction work can go underground. And that's described, again, by Ms. Kirby, the project engineer, in her declaration. I would note that there are no references at all in the record to any impacts that allegedly occurred during that time period. I would acknowledge there are a few things that pertain to the opening phase of the stub tunnel construction between, you know, February of 2005 and June of 2005. But after that, until the very, very tail end of the project, there's nothing, nothing in the record that supports that there were these types of impacts going on. So also let me briefly address the citation to the Richards case from the United States Supreme Court. And we would argue, by the way, that the Richards standard and the federal standard for whether or not you can recover for this sort of nuisance type taking is the same, excuse me, the same as Washington law. In other words, that you would have to make the same showing that you've suffered some sort of, you know, substantial damage peculiar to you, that you've effectively been singled out. You'd also have to make a showing that the damage was permanent, even if you could show that you had been singled out. And the district court correctly concluded that neither of those showings had been met, and so those would have been alternative grounds to deny relief. I also want to briefly touch on the fact that even if there had been a taking found, that the district court would have been within its rights to dismiss the case on the alternative ground that there was no further just compensation owed. The appellants obtained $9.1 million in the sale of the property during the construction period that they were talking about. As you heard them say here, they do not allege that the sale price was in any way affected by the construction. They conceded that in their depositions that they obtained full and fair market value. And under those circumstances, for example, if Pandy Cameron wants to claim that they're entitled to a share of what was recovered for the sale, that's an issue as between them. But the idea that Pandy Cameron, for example, could further recover consequential damages like a loss of goodwill or lost profits that they're alleging, that would not be something that would be appropriate in a takings cause of action. And I certainly think it's also worth noting, as the district court did, that in this case the plaintiffs, both Pandy Cameron and the Andonians, had originally filed state tort claims in 2004, in which apparently they were going to pursue these types of damages. Then they voluntarily dismissed those claims in 2005, only to refile this action years later as an inverse condemnation claim, and after the tort statute of limitations had expired. So the district court was careful to emphasize in his opinion that I'm not saying that there's no remedy here. If you can show a temporary impact that actually causes actionable damage, then you may have a claim. Because we don't have sovereign immunity against tort claims in Washington State, and so that there is a remedy available in those situations, but that he was not going to expand or twist the law of takings to suit the facts of this case under that circumstance. If the court has any further questions on the takings claim, I'd be happy to answer those. I was going to briefly touch on the motion to certify, otherwise I'd be fine. I was going to ask about the motion to certify, so go to that. Okay, Your Honor. Well, I believe the standard in this circuit under the Thompson case, when a party has lost a dispositive motion below and then comes up on appeal and seeks certification for the first time, would be a requirement to show compelling circumstances. We looked, and I couldn't find a case that the court had found compelling circumstances, but certainly this case would not be one of those cases, because the allegation here is that basically Article I, Section 16 of the Washington Constitution provides some sort of greater entitlement to relief. That's the Washington State Takings Clause. Now, that issue was squarely raised in the briefing at the district court below, and the plaintiffs acknowledged in their brief that they were not seeking that claim. They were not making the argument, for example, that the state constitutional provision in Washington provided greater protection than the Fifth and Fourteenth Amendment Takings Clause, and that is the foundation for their motion to certify. This court has said before that when there is a federal and state constitutional issue and the two are parallel to one another, that the case can be decided on the federal constitutional basis, and that's, for example, the Vernon decision that's cited in our opposition to the motion to certify. And in this case, the court can make that determination by reference to the Fifth and Fourteenth Amendment case law and Washington cases interpreting federal law and can affirm on that basis, and that does not create a need to certify. Certainly it doesn't establish a compelling circumstance to certify for the first time on appeal. You answered my question. Thank you, Your Honor. Out of standard or review. Yes. I'll just say in closing that the implications also from a policy perspective of finding a taking in a circumstance like this were well considered by the district court and are appropriate in consideration in affirming the district court, and namely that local governments must be able to improve public infrastructure without having to condemn all the surrounding properties in advance on the supposition that they may be temporarily impacted. State law provides a number of remedies in the case that those impacts do occur, but in this instance, for example, if the appellant's argument were carried to its logical conclusion, the suggestion would have been that the City of Seattle and Sound Transit would have been required to not only condemn property interests from Handy Cameron and the Andonians, but also from the surrounding businesses and surrounding owners, and that would have included the Hyatt Hotel and the Paramount Hotel and the Paramount Theater and Ruth's Chris Steakhouse, all of these businesses, and there was a residential property, the 801 Tower. They were all there. They were all in the same area. They all changed. That's not before us, is it? What's that? That's not before us. It's not before us, Your Honor, but it is a valid policy consideration supporting the rule why we do not find that there are temporary impacts. Some people ask for relief and some other people don't. It's not consequential to our decision, I think. Your Honor, I would agree that the question of whether they're entitled to relief is certainly not consequential. The question of whether temporary impacts do give rise to a taking when there are many, many property owners or lessees that might be impacted, that is a relevant consideration. I thank the Court very much. Thank you. Counselor? Good morning. My name is Bob Raleigh. I will be arguing the rebuttal argument. On behalf of both? I don't have much time. On behalf of both appellants? On behalf of both. I represented Hannah Cameron below, but their interests are sufficiently parallel that we decided this would be the cleanest way to divide the argument. The points the counsel made, one of them in particular, perhaps I misunderstood him, but I understood him to say that there was absolutely no evidence that Hannah Cameron and Braiseth were impacted during the utility relocation during this 2004 effort. You will find in the record, and it's recited at some length in our briefs, that there are declarations were submitted from Mr. Andonian, his son Brad Andonian, and from Mr. Braiseth as well concerning what their experience was in the store with the activity going on out in the street. Now, we know that had to have been before February of 2005, because they left February 2005. So they were describing, the impacts they were describing were, in fact, impacts during that 2004 utilities. Well, they don't really say that, do they? Well, but it's deep. I read their affidavits pretty carefully, because it seems to me that your motion is for summary judgment based on genuine issues of material fact. So I read what they said very carefully, and I guess I'm trying to figure out if their total effort is between the time the construction started, which was January, first part of January, the snub tunnel construction begins, until they left at the end of January, or what? Because their affidavits don't say anything. Well, the actual impacts of the snub tunnel construction did not start until early 2005, about the time that they vacated. And since those descriptions were of their occupancy and what they experienced, it's deducible, certainly, that their firsthand experience was limited to the time they were present in the store, which ended in February of 2005. So to the extent that that's an issue, I just wanted to address it. I think there is evidence in the record to address those impacts at that time. But I think that what I mainly would like to argue in rebuttal is that whatever else is clear from the Washington cases involving inverse condemnation, the Washington courts do not intend that a property owner who is impacted by nuisance impacts have no remedy. To the extent that they deny an inverse condemnation remedy, they refer to a remedy in tort. So there's a remedy of some kind that's recognized. But when the impacts are nuisance impacts, and if the nuisance is generated by a public entity who is acting pursuant to statutory authority, in our brief we point out that state legislature said, yeah, you can put tunnels in and run trains on them. A nuisance action is not available. A tort nuisance action, a statutory action is not available against them. And so to deny a takings claim based upon the nuisance activity would be to deny a remedy outright. That's why this case, the second time it was brought, did not include a nuisance claim. Now, there was no trespass. Nobody alleged the existence of a trespass, such as, for example, what lay at the route of the North Pacific Railroad versus Sunnyside Irrigation District case, the trespass by water. And so there was a remedy. You've got a tort remedy and trespass. It's a single incident. That's where you should be seeking your remedy. That just doesn't apply here. Thank you, then, for your argument. Am I up? You're up. You're in the deficit. All right. Thank you. All right. Then case 0935361, Cameron and Company versus Central Puget Sound is submitted. Thank you, counsel, for your argument. Very much. We appreciate it. Recess for the day.
judges: Goodwin, Hawkins, Smith N. R.